## WOOTTON LAND & FUEL CO. et al. v. OWNBEY.

## OWNBEY v. MORGAN et al.

(Circuit Court of Appeals, Eighth Circuit. March 30, 1920.)

### Nos. 5265, 5266.

1. **Corporations ⬤⧴425(2)—Stockholders held estopped by individual agreement to deny validity of assent of corporation to contract.**

    While stockholders of a corporation cannot bind it by any action taken by them individually, where the owners of the entire stock of a corporation made an agreement for settlement of cross-accounts between the corporation and one of them, and for payment for future services to be rendered by him to the corporation, and he acted in reliance on such contract, the other stockholders are estopped to deny the validity of the assent of the corporation to the contract.

2. **Equity ⬤⧴196—Cross-bill unnecessary to recovery by defendant in suit for accounting.**

    In a suit for an accounting, no cross-bill by defendant is necessary, in order that he may recover any balance in his favor.

3. **Appeal and error ⬤⧴1022(3)—Findings of fact by master and trial court not reviewable.**

    A finding of fact on conflicting evidence, in which a master and the trial court have concurred, should not be reversed by an appellate court.

4. **Account stated ⬤⧴1—Must show balance due and from whom.**

    It is of the essence of an account stated that it be shown that there is a balance due, the amount of that balance, and from whom it is due.

5. **Account stated ⬤⧴19(3)—Evidence too indefinite to establish.**

    A resolution of the stockholders of a corporation approving a report of the manager cannot operate as stating the account between the manager and the corporation, and precluding a further accounting, where the report is not in evidence and in the absence of proof of its contents.

6. **Account ⬤⧴18—On accounting by fiduciary, he has burden of showing performance of trust.**

    When the defendant is an accounting party, and occupies a fiduciary relation toward plaintiff because of money or property intrusted to him, the burden is on him to show that he has performed his trust and the manner of its performance; and in making proof of credits claimed by him he should present an itemized statement showing details of expenditures, with the vouchers, receipts, and memoranda supporting his claims. This duty to account is not fulfilled by a mere general statement that the money was expended for plaintiff's benefit or business, or by a general denial that any of plaintiff's money was taken for the personal use of defendant.

7. **Courts ⬤⧴493(2)—Proceeding in federal court held not to bar proceeding in state court.**

    A suit by executors and others on behalf of all the stockholders of a corporation for an accounting between defendant and the corporation *held* not to interfere with the jurisdiction of a state court over a suit by such executors against the same defendant on a personal obligation of defendant to their decedent, in which defendant's stock was attached.

---

⬤⧴For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the District of Colorado; John A. Riner, Judge.

Suit by the Wootton Land & Fuel Company and others against J. A. Ownbey. Cross-appeals from decree. Remanded, with directions.

These cases present an appeal and a cross-appeal from a decree in a suit for an accounting. It was brought by the holders of a majority of the capital stock of the Wootton Land & Fuel Company, a corporation (hereafter called the Wootton Company), and for the benefit of that company and of all its stockholders, and its main object was to secure an accounting from the defendant, J. A. Ownbey, as one of its officers, of corporate property and money received by him. The Wootton Company was incorporated in 1906 under the laws of Delaware. The company acquired a large amount of land in Colorado and New Mexico, operated extensive coal mines situated on this land, and owned and managed coal tipples, power house, and other shops and buildings connected with its mining operations. It had a large number of houses, in which miners lived as its tenants. It operated a general merchandise store. It also operated a ranch of over 10,000 acres, upon which it kept live stock. The laws of Delaware provided that the business of every corporation should be managed by a board of not less than 3 nor more than 13 directors. Rev. Code of Delaware 1915, § 1923. The articles of incorporation of the Wootton Company provided that its affairs should be managed by a board of 5 directors, who could adopt by-laws for the management of the company's business. The capital stock of the company was divided into 100,000 shares. At its organization this stock was owned as follows: J. P. Morgan, 41,667 shares; Ogden. Mills, 16,667 shares; B. P. Cheney, 8,333 shares, and J. A. Ownbey, 33,321 shares. The remaining 12 shares then and ever since stood in the names of four other persons, for the purpose of qualifying them to act as directors; but the real ownership was in some of the principal stockholders named or in their successors in interest. The 5 directors at all times have been the 4 persons holding such qualifying shares and Mr. Ownbey. Mr. Mills sold his stock early in 1909 to Morgan and Cheney.

The president of the corporation, from its organization until February 27, 1908, was William C. Prime, and thereafter was Thomas W. Joyce. Mr. Ownbey has been vice president and treasurer since the company's organization, and after February 27, 1908, was authorized to generally direct the operations of the company and to supervise and manage its affairs and employés. Mr. Ownbey resided in Colorado, and most of the time resided on the company's land, and was the active manager of the company's physical property there, and directed its business operations. Mr. Cheney was a visitor for a very short time at the company's property on several occasions, but Mr. Morgan never saw the property. Neither Mr. Morgan nor Mr. Cheney were ever directors or officers of the corporation. The directors of the corporation held meetings from time to time, and minutes were kept of their action. Such meetings were held on October 7, 1906, on February 16 and March 5, 1907, on February 10 and February 27, 1908, and on March 28, 1910.

Under the issues formed by the pleadings, the propriety of an accounting was not disputed, and a master was appointed by the court for that purpose, and his report was confirmed by the court, over the exceptions of both parties, and each has presented an appeal to this court.

One of the chief questions in the case is the effect that is to be given to conversations between Mr. Morgan, Mr. Cheney, and Mr. Ownbey, in New York, in 1909, in which Mr. Ownbey claims that agreements were made, binding on the Wootton Company, (1) that in consideration of some proposed slight changes in the amount of capital stock held by these 3 stockholders, and because of a proposed transfer to the company of some property, theretofore held for it in trust by Mr. Ownbey, it was agreed between these 3 stockholders that all claims between the company and these stockholders should thereafter be extinguished, and that this agreement was carried into effect at a meeting of the stockholders on April 16, 1910, when Mr. Ownbey presented a full report of his transactions with the company and it was approved; (2) that Mr. Ownbey was to have a salary from the Wootton Company of $1,000 per month, and also to have his living expenses, not to exceed $500 per month.

A special defense in Ownbey's answer set forth his claim that he had fully accounted for his transactions before April 16, 1910, as follows: "Avers that on April 16, 1910, all of the acts and doings of this defendant, and all transactions by him had in the premises for and on behalf of said company, were duly and fully presented to the stockholders of said company at a meeting thereof held on said day at the town of Wootton, Colo., and at which all the stock of said company was represented and voting, and that all of his said acts and doings theretofore so had, done, and performed by him, for and on behalf of said company and said stockholders, were then and there fully ratified and confirmed, and in all respects approved thereby."

Because of the issue presented by this special defense, the case was first referred to a special master, to hear testimony and to report whether, on April 16, 1910, the accounts between the Wootton Company and Ownbey "were settled and adjusted, and, if so settled and adjusted, what balance of account, if any, existed and was fixed as the result of said settlement and adjustment, and against which of said parties." The master was also directed to report whether any such accounting or settlement was valid, so as to preclude any further accounting, and he was directed not to proceed with the accounting until after the court had disposed of this issue. After the hearing on this issue the master reported that Morgan, Cheney, and Ownbey were the only persons beneficially interested in the ownership of the capital stock of the Wootton Company on December 15, 16, and 17, 1909, and that then these three persons met in New York and agreed among themselves for the conveyance to the company of certain property, and that all claims between these three stockholders, and between the company and each of them, should be settled and adjusted, and the stock of the Wootton Company should be redistributed, and that a meeting of the company should thereafter be held to carry this agreement into effect. The master further found that on April 16, 1910, all of the stockholders were present or represented by proxies at a meeting of the stockholders at Wootton, Colo., that Ownbey then presented a report showing all of his transactions with the company, and the moneys received and paid out by him on its behalf, and that this report was examined and found correct, and by unanimous vote it was approved. He reported that no testimony had been offered to show what balance of account was shown by the report, and that he could not determine what balance, if any, existed, nor against which of the parties. He found that the property referred to was at that meeting conveyed to the Wootton Company and the stock redistributed. The master reported as his conclusion that the stockholders were therefore precluded from having an accounting for transactions prior to April 16, 1910. The court approved of this report, over objections of appellants, and ordered the accounting to proceed of transactions after April 16, 1910. After a prolonged hearing the master stated an account, and exceptions of both parties thereto were overruled, and the master's final report was approved, and judgment was rendered in favor of Ownbey for $53,280.67 against the Wootton Company.

Tyson S. Dines and Pierpont Fuller, both of Denver, Colo. (Henry T. Rogers, Daniel B. Ellis, Lewis B. Johnson, and George A. H. Fraser, all of Denver, Colo., on the brief), for Wootton Land & Fuel Co. and others and Morgan and others.

Harry S. Silverstein and Henry E. Lutz, both of Denver, Colo. (Herbert S. Hadley, of Boulder, Colo., on the brief), for Ownbey.

Before HOOK and STONE, Circuit Judges, and MUNGER, District Judge.

MUNGER, District Judge (after stating the facts as above). [1] The special master allowed to Ownbey a sum of salary and his living expenses. This was based upon testimony by Ownbey and Cheney as to the alleged agreement between Morgan, Cheney, and Ownbey, at

Morgan's library in New York City, in December, 1909, whereby it is claimed Ownbey was to receive this allowance. The finding of the master that Ownbey was not required to account to the company for his transactions occurring before April 16, 1910, was also partly based upon this conversation and agreements claimed to have been made at that time. By proper exceptions the question is presented, upon such facts, whether those who are not directors or officers of a corporation, but are the owners and holders of almost all of the capital stock and are the beneficial owners of the remaining shares, which stand in the names of nominal owners, may bind the corporation by a contract between themselves whereby a debt in favor of the corporation is to be extinguished, and an obligation of the corporation in favor of one of them imposed, when the articles of incorporation place the management of the company's affairs in the hands of its board of directors. The further question is also presented whether such stockholders, assuming to contract on behalf of the corporation, are estopped from denying such an agreement to be the agreement of the corporation, if the obligee has acted upon the faith of this agreement as an act of the corporation. The general rule as to contracts and conveyances on behalf of the corporation was stated by Chief Justice Shaw in Smith v. Hurd, 12 Metc. (Mass.) 371, 385 (46 Am. Dec. 690), as follows:

"The individual members of the corporation, whether they should all join, or each act severally, have no right or power to intermeddle with the property or concerns of the bank, or call any officer, agent, or servant to account, or discharge them from any liability. Should all the stockholders join in a power of attorney to any one, he could not take possession of any real or personal estate, any security or chose in action, could not collect a debt, or discharge a claim, or release damage arising from any default, simply because they are not the legal owners of the property, and damage done to such property is not an injury to them. Their rights and their powers are limited and well-defined."

And this rule has often been followed. Humphreys v. McKissock, 140 U. S. 304, 312, 11 Sup. Ct. 779, 35 L. Ed. 473; De La Vergne Co. v. German Savings Inst., 175 U. S. 40, 53, 54, 20 Sup. Ct. 20, 44 L. Ed. 65; Sellers v. Greer, 172 Ill. 549, 50 N. E. 246, 40 L. R. A. 589; Puritan Coal Mining Co. v. Pennsylvania R. Co., 237 Pa. 420, 85 Atl. 426, 432, Ann. Cas. 1914B, 37; 2 Cook on Corps. (7th Ed.) § 709. See, also, First Nat. Bank of Memphis, Tenn., v. Towner, 239 Fed. 433, 440, 152 C. C. A. 311; Woodruff v. Shimer, 174 Fed. 584, 586, 98 C. C. A. 430; Denver Engineering Works Co. v. Elkins (C. C.) 179 Fed. 922.

But the principle of equitable estoppel is frequently applied to deny a defense that might otherwise have prevailed. Nothing is better settled than that one, who, by his acts or representations, or by his silence when he ought to speak out, intentionally or through culpable negligence, induces another to believe certain facts to exist, and the latter rightfully acts on such belief, so that he would be prejudiced, if the former is permitted to deny the existence of such facts, is thereby conclusively estopped from making such denial. Dickerson v. Colgrove, 100 U. S. 578, 580, 25 L. Ed. 618; Union Pacific Ry.

Co. v. United States, 67 Fed. 975, 979, 15 C. C. A. 123; Canadian Northern Ry. Co. v. Northern Miss. Ry. Co., 209 Fed. 758, 126 C. C. A. 482; 2 Pom. Eq. Jur. § 805.

In this case Morgan and Cheney, stockholders, but assuming to act for the corporation, are said to have made a contract for the benefit of the corporation with Ownbey, the owner of the remainder of its stock, and Ownbey, claiming to have relied upon those agreements, alleges he has executed his part of the agreement. If the contracting stockholders permitted Ownbey to render services and expend moneys, and to act in accordance with such a contract, they may not be heard, in a suit brought for the benefit of themselves, as the only other owners of stock, to deny the validity of the assent of the corporation. Colorado Springs Co. v. American Pub. Co., 97 Fed. 843, 853, 38 C. C. A. 433; United States v. Milwaukee Refrigerator Transit Co. (C. C.) 142 Fed. 247, 255; Breslin v. Fries-Breslin Co., 70 N. J. Law, 274, 282, 58 Atl. 313; In re Newman, [1895] L. R., 1 Ch. Div. 674, 686; Ebelhar v. Nave (Ky.) 119 S. W. 1176; First Nat. Bank v. Winchester, 119 Ala. 168, 24 South. 351, 72 Am. St. Rep. 904; Bundy v. Iron Co., 38 Ohio St. 300–311, 312; Brown v. De Young, 167 Ill. 549, 555, 47 N. E. 863.

[2] In Ownbey's answer he set forth a counterclaim alleging an employment as manager by the company, the performance of the services, and that they were reasonably worth $1,000 per month. Appellants assert that proof of an express contract for payment of that amount for such services was inadmissible under the plea of quantum meruit. Appellants, in their replication to this answer, alleged the nonexistence of any contract, express or implied, between the company and Ownbey, relating to compensation for his services. In an action for an accounting, no cross-bill on the part of the defendant is necessary in order that he may recover any balance in his favor. The plaintiff by his bill in such a case submits himself to the result of the accounting, whether it be for or against him. Whittemore v. Patten (C. C.) 84 Fed. 51, 56; McManus v. Sawyer (D. C.) 231 Fed. 231, 238; 1 Corp. Jur. 639.

The court, on an application of the master for instructions relating to the taking of the account, ordered the master to disregard all matters of pleading and to proceed with the accounting in accordance with equity rule No. 63 (198 Fed. xxxvii, 115 C. C. A. xxxvii). No exception was taken to this order, and it is now too late to insist that Ownbey was limited to the proof of an implied contract for services.

This brings us to the next controverted question—whether agreements were made such as Ownbey claims. As to the salary and living expenses, both Cheney and Ownbey testified repeatedly that a verbal agreement was made at a meeting of the three men in Morgan's library by which Ownbey was to continue as the business manager of the company, and that he was to receive for such services $1,000 per month and also his living expenses for himself and family, not to exceed $500 per month. Morgan's death before this suit was brought precluded the possibility of testimony from the only other participant in this alleged transaction, but there are many circumstances that

militate against the probability of any such contract. Some of these facts may be briefly stated. Ownbey never drew or demanded any salary in the 57 months that he continued to act. The company's books were kept under his direction, and no entry was made relating to either of such items. In a voluminous correspondence thereafter maintained between Ownbey and Morgan, Cheney, Mills, and Joyce, no mention is made of the subject. The two bookkeepers testified that Ownbey told them his agreement was that he was to receive no salary, but that he should have the profits of the boarding house in lieu of it, and these profits were credited to his account on the books. In monthly statements, sent from Ownbey to the stockholders and president of the company after the middle of 1910, there was a personal account showing the profits of the boarding house to be credited to Ownbey, but no charge against the company for salary or living expenses was shown. In June, 1911, Ownbey wrote Cheney a letter, a copy of which was sent to Joyce, in which he stated that the amount the company owed him was $3,000, and also the sum of $15,000, because he had given his personal check for the $15,000 to take up that amount of the company's obligations. His salary up to that time, at the rate he claims, would have amounted to $14,000.

In his answer he set forth a counterclaim for the reasonable value of his services, but did not plead any agreement that he was to be paid a salary or be allowed his living expenses. The plaintiff employed an accountant in December, 1915, to go over the company's books, and he told Ownbey that the books showed a balance against him, and that there was nothing on the books to show an allowance for salary or living expenses. Ownbey replied that there should be such entries, and that he had an agreement, and that it was in the correspondence; but, failing to find it, he claimed it was in the minutes, and, again failing to find any note of it there, claimed it was a verbal agreement. He was asked as to the amount of his salary, but he deferred answering until he had seen his attorney, and then stated that he was to have $1,000 per month for both salary and expenses after April 16, 1910. Ownbey, on behalf of the corporation, in 1912 asked for a loan from a bank, and the bank required an audit of the books. Ownbey hired auditors, who reported to Ownbey in writing that no salary was charged for him, but that he was credited with profits on the boarding house for 1911. The bank made the loan on the faith of this report. The corporation records are silent as to any allowance to Ownbey for these purposes.

[3] Ownbey explains some of these admissions by the statement that he did not wish the bookkeepers to be advised of the amount of his salary, lest they should demand higher salaries, and this was pursuant to an understanding he had with Cheney and Morgan. Ownbey gave practically his entire time to the management of the company's affairs, and they were extensive and required the careful supervision by some one who lived at the scene of operations. It is not incredible that some one should have been employed and have been given a liberal salary and a liberal allowance for living expenses for doing this work, inasmuch as Cheney and Morgan were absent, and

the responsibilities were onerous. The circumstances we have detailed and others, tend to discredit the existence of such a contract, if it depended alone upon the testimony of Ownbey; but Cheney's testimony as to the making of the contract is clear and no sufficient impeaching evidence discredits his testimony. While the view of this court might be in favor of a different conclusion from the testimony of Ownbey, the case is one where a master and the trial court have concurred in a finding of fact upon conflicting evidence, and that finding should be confirmed by this court. Davis v. Schwartz, 155 U. S. 631, 636, 15 Sup. Ct. 237, 39 L. Ed. 289; Coder v. Arts, 152 Fed. 943, 946, 82 C. C. A. 91, 15 L. R. A. (N. S.) 372; Nichols v. Elken, 225 Fed. 689, 692, 140 C. C. A. 563. And this result is compelled, if credence is given to Cheney's undisputed testimony.

The finding that the plaintiffs were not entitled to an accounting of transactions between the corporation and Ownbey prior to April 16, 1910, rests upon the testimony of Ownbey and Cheney taken upon the hearing upon the special defense, and upon the interpretation of the minutes of the stockholders' meeting held on that day. The court may have been influenced in its final confirmation of the master's findings by the testimony of these same witnesses as to this conversation, which was again given later during the hearing and upon other features of the case. A careful review of the evidence of these witnesses leads to the conclusion that the agreement claimed to have been made, in the conversations at Morgan's library and completed at the stockholders' meeting, was not, as defendant now claims, for an accord and satisfaction between the corporation and Ownbey for any balance of account that should be outstanding at the time of the stockholders' meeting, provided that Ownbey made the conveyances and that the stock was redistributed in the agreed proportions. While some of the testimony of these witnesses, stating conclusions rather than the conversations, might bear this interpretation standing alone, the rational construction to be put upon their testimony is that these stockholders agreed that a stockholders' formal meeting should be held soon thereafter, and that at that meeting, in the language of Cheney, they were "to consummate and put into legal form this agreement which we had had"; that Ownbey would then convey to the Wootton Company the property held by him in trust for it; that there would be a redistribution of the capital stock, by which Ownbey's proportion would not be changed, and Morgan's would be changed but very slightly, and this would be a settlement of the proportionate stock interests. This preliminary agreement was in December, and the stockholders' meeting occurred in the following April. Manifestly, it could not be known what balance of account would be owing to or by Ownbey at that time.

Ownbey admits a balance was due to the company from him of $8,287.83 on April 16, 1910, and that he is accountable for it, which would not have been true, if all accounts were to be then balanced at zero. It is also shown that he had other balances in banks belonging to the company of $11,072.94. His page of the ledger account in the books of the Wootton Company showed a further indebtedness

to the company of $23,638.78. The special accountant was offered as a witness to show that he was further indebted, at that time to the company in the sum of $65,843.77. At that same meeting in Morgan's library an agreement in writing was made by which $200,000 more was to be advanced to the capital of the company, to be sent to Ownbey. It is incredible that men of the business sagacity of Morgan and Cheney would agree that one who handled such large sums, and who was later shown to be indebted so largely, should be excused from accounting for any balance that might then exist for so slight a cause. Moreover, whatever preliminary arrangements were made were merged into the formal action at the stockholders' meeting, as evidenced by the minutes. The minutes recite that Ownbey presented a report of his acts as vice president, treasurer, and general manager, and that that report brought down to date the management of the Wootton Company's property and the moneys received and paid out by him for the company, and that this report was examined and found correct. A resolution was passed approving the report. The report has not been produced in evidence in this case, nor its contents shown; but the formal action of the stockholders at a meeting at which all were present or represented by proxies evidences the final transaction between the parties. The minutes were afterward presented to Morgan, and he approved them as a correct statement of the transaction intended. Cheney himself presented the resolution, and Ownbey cast his own votes for it.

[4, 5] The defendant relied upon this resolution and the preceding report as an account stated with the Wootton Company. It is of the essence of an account stated that it be shown that there is a balance due, the amount of that balance and from whom it is due. Story, Eq. Pl. (10th Ed.) § 798; Burk v. Brown, 2 Atkyns, 397–399; Harrison v. Farrington, 38 N. J. Eq. 358, 362; Allen v. Woonsocket Co., 11 R. I. 288, 297; 1 Daniell's Ch. Pl. & Pr. (6th Am. Ed.) 665; 1 Corpus Juris, 641; 1 Ruling Case Law, 211; 1 Encyc. Pl. & Pr. 101. As there was no proof of the balance shown by this report, the court erred in overruling plaintiffs' exceptions to the report of the master, holding that the plaintiffs were estopped from asking for an accounting prior to April 16, 1910, and in the order to the master to take the accounting only from and after that date. This error requires a reversal of the decree, and the case will be remanded, with directions to proceed with the accounting with Ownbey as to these prior transactions.

In stating the account between the parties after April 16, 1910, a balance was found by the master at that date, as has been stated, of $8,287.83, consisting of cash on hand in the company's office and a deposit in the Trinidad National Bank. This amount was evidently derived from Cheney's testimony, but he did not testify, nor was there other evidence to show, what balance was shown by Ownbey's report, which was approved by the minutes of the stockholders' meeting, as has been stated. Moreover, Cheney does not testify that this was all the cash on hand as a fact, but only as a conclusion, and as true so far as he knew, and the evidence shows no sufficient basis

for his knowledge. The accountants of defendant and plaintiffs agree, and it stands established by undisputed testimony, that there was at that time the further sum of $10,144.64 in the First National Bank of Boulder in the name of Ownbey as trustee, and the sum of $928.30 in the American Exchange National Bank in the name of Ownbey, and these moneys belonged to the Wootton Company, and were balances of sums contributed by Morgan and Cheney to its capital account. The evidence is also undisputed that Ownbey pastured a number of his cattle and one horse on the company's lands, and that the reasonable charge for this service is $629.27.

Exceptions were taken to many items of credit and discharge claimed by Ownbey. The master found that many of these items were improper charges against the Wootton Company, and disallowed them, and no exceptions on the part of Ownbey now call in question this action. The credits allowed Ownbey, and which are now questioned by appellants, are claims of disbursements of the company's funds by Ownbey. The items are very numerous, and the evidence relied upon cannot profitably be set out in detail. So far as the findings of the master depend upon conflicting testimony or credibility of witnesses, and the evidence in support of the item is legally competent, the finding must be allowed to stand. But where items are supported by no competent evidence the findings must be disregarded, because founded upon a mistake in law. The defendant was permitted to testify to general statements that he had never used, taken, nor expended any funds of the Wootton Company for his personal use, without having them charged to himself on the company's books. He qualified this denial by an admission that he had used some of these funds for his living expenses, but claimed that in such cases the withdrawals had been charged to the company's general expense account. The master evidently was influenced by this testimony in allowing many of the credits, for other evidence is lacking in support of them as matters of discharge. The rules of law that were applicable in the taking of the accounting may be briefly stated:

[6] When the defendant is an accounting party, and stands as one occupying a fiduciary relation toward the plaintiff, because of money or property intrusted to him, the burden is upon him to show that he has performed his trust and the manner of its performance. He owes this duty because of the confidential relation he bears to his principal, and because he is presumed to know how he has performed his duty. 1 Mechem on Agency (2d Ed.) § 1344; 1 Corp. Jur. 643; 3 Gr. on Ev. § 253; 1 Story, Eq. Jur. (14th Ed.) § 625; Marvin v. Brooks, 94 N. Y. 71, 75; Little v. Phipps, 208 Mass. 331, 335, 94 N. E. 260, 34 L. R. A. (N. S.) 1046. He must therefore prove any allowances or credits that he may claim to have made on behalf of his principal. In making proof of credits claimed by him, he should present an itemized statement, showing the details of expenditures, with the vouchers, receipts, and memoranda supporting his claim. Meth. Epis. Ch. v. Jaques, 3 Johns. Ch. (N. Y.) 77, 114; Muir v.

Kalamazoo Corset Co., 155 Mich. 441, 448, 119 N. W. 589; Campbell v. Cook, 193 Mass. 251, 256, 79 N. E. 251; Chicago Title Co. v. Ward, 113 Ill. App. 327, 331; Moyses v. Rosenbaum, 98 Ill. App. 7, 9; 1 Mechem on Agy. (2d Ed.) § 1344. It was formerly the rule that the accounting party, if credible and uncontradicted, could support by his own oath sums not exceeding $20; but even in that case he must show to whom the amount was paid, for what, and when, and the whole amount of such items could not exceed $500. Remsen v. Remsen, 2 Johns. Ch. (N. Y.) 496, 501; 2 Bates, Fed. Eq. Proc. § 764; Daniell's Ch. Pl. & Pr. (6th Am. Ed.) 1227, 1228. Whatever relaxation from this rule may now be indulged, it is still requisite that the accounting party shall show in detail, and not in round sums, the items expended, and show when, to whom, and for what purpose the payments were made, so that his principal can make a reasonable test of the accuracy of his claim.

It follows as a corollary to these principles that the duty to account is not fulfilled by a mere general statement that the money was expended for the principal's benefit or business, or by a general denial that any of the principal's money was taken for the personal use of the trustee. Such statements are but the conclusions of the witness, and afford no reasonable opportunity to the principal to test the fact or the propriety of the expenditures, and give the court no basis for determining from the facts of each transaction whether the trustee has faithfully performed his duty. 1 Mechem on Agy. (2d Ed.) § 1344; New York Bay Cemetery Co. v. Buckmaster (N. J. Ch.) 33 Atl. 819; Webb v. Fordyce, 55 Iowa, 11, 14, 7 N. W. 385; Farmers' Warehouse Ass'n v. Montgomery, 92 Minn. 194, 200, 99 N. W. 776; Willis v. Clymer, 66 N. J. Eq. 284, 287, 57 Atl. 803; In re Gaston, 35 N. J. Eq. 60, 64; Romig's Appeal, 84 Pa. 235, 237; Wolf Co. v. Salem, 33 Ill. App. 614, 617; 2 Bates, Fed. Eq. Proc. § 764; 2 Daniell, Ch. Pl. & Pr. (6th Am. Ed.) 1227, 1228.

Applying these principles to the groups of credits claimed by Ownbey makes the proper disposition of them comparatively simple. The "general expense" items which are attacked amount to $2,288.75. As to each of the numerous items there are either admissions by Ownbey as a witness, or evidence from the checks or vouchers or book entries, or a lack of testimony showing an expenditure for the company's purposes, that requires the rejection of the claims. Ownbey confesses a lack of memory as to the circumstances of the expenditures, except that he insists in general statements that they were for the benefit of the company, which we have held does not discharge his duty to account. The "living expenses" group of items amounts to $22,484.57. The master finds this was received by Ownbey by checks that he drew or from checks deposited, and was used by him in payment of his living expenses; but the master also finds that there was no evidence of the amount expended by Ownbey for these living expenses in any one month or any one year, and that the evidence as to the expenditures of moneys in this account is very unsatisfactory. He allowed the amount because of the manner

in which the accounts were kept, and because of the acquiescence of all persons interested. The contract relied upon by Ownbey allowed him his living expenses, not to exceed $500 per month, or $6,000 per year. Claiming under a definite contract, it was incumbent on Ownbey to show that his expenditures came within its terms. The absence of proof of the amount of such expenses per month or per year was a failure to show that he was entitled to credit therefor, and the item should have been disallowed. There was no acquiescence by the company in the matter of the keeping of the accounts that requires any different conclusion. The books were kept by bookkeepers under Ownbey's direct supervision. It is not shown that the other officers or stockholders knew of any book entries charging them with notice of this claim, because, as already stated, the books disclosed no charge of any kind of Ownbey's living expenses. The entire amount appeared on the books as either charged to Ownbey's personal account or as charged to the general expense account of the company.

Traveling expenses allowed and attacked amount to $10,866.85. Ownbey claimed and was allowed a large sum as credit for traveling expenses in connection with the company's business, and another group of such claims was disallowed. The items composing the balance now in controversy were not supported by receipts or written memoranda showing the expenditures to have been for the company's benefit, nor was there other competent evidence of that fact; $1,365 of the amount was charged on the company's books against Ownbey's personal account. Under the proofs the amount was improperly credited to Ownbey.

The "legal expense" account was a large one. Some of it was allowed and some disallowed, and the balance in controversy is $5,368.61. The evidence again shows either a lack of knowledge on the part of Ownbey, as the only witness testifying on the subject, or else evidence is entirely lacking, to show that these expenses were incurred on behalf of the company. Much of the amount was drawn by checks payable directly to Ownbey. He must be held to have failed to have sustained the burden of proof required of him.

Intoxicating liquors, $1,914.97. This amount is shown to have been disbursed to the dealers who sold liquors, and was for liquors furnished to the Wootton ranch house or given by Ownbey as donations to other persons. Appellants' objection to the item is because of lack of evidence showing the portion of the liquor used by Ownbey for his personal uses. He testified it was all used for the company, and we think that was sufficient to support the master's finding, as further particularization could not reasonably be required of the final use of these liquors.

Taxicab expenses, $1,436.25. There are proper receipts for these bills, and Ownbey's testimony shows that the expenditures were all for the company's business, and for the same reasons as stated relating to the previous item the master's allowance of the amount should stand approved.

Telephone bill, $1,413.55. The testimony of Ownbey was relied upon to show that these charges were properly made to the company; but it was so contradictory, and showed such lack of memory, that the allowance of the item cannot be sustained.

Interest on notes, $1,392.38. This sum was used in paying interest on notes, but the notes were not entered upon the company's books. The Wootton Company's notes were entered on its books, and the interest on those notes was also entered. There was a lack of testimony on the part of Ownbey, and he did not sustain the burden that was laid upon him to show that this was a proper charge. The item should have been disallowed.

Miscellaneous items, $1,788.79. A number of items are embraced in this total, and each presents its separate state of facts. The charges for expenditures to Sager, $500; for turkeys, $88.45; for travel expenses of Bailey and others, $75; for expense in settling for death of a miner, $250—total, $913.45, are supported by sufficient evidence. The remainder, aggregating $775.34, entirely lack evidence to support them, and should have been disallowed.

Supplementary account. The allowance in favor of Ownbey of two checks of $1,000 each was called to the attention of Ownbey as a witness, but he was unable to remember the purposes of the expenditures, and they were otherwise unsupported, and should have been disallowed. As we have held Ownbey chargeable with the balances in the First National Bank of Boulder and in the American Exchange National Bank of New York, he is entitled to credit for $2,260.55 for checks drawn on those banks, as shown in his supplemental account.

Another item of $250 to C. E. Stratton was improperly allowed, because it was paid on April 22, 1909, and, if it is a valid charge, should be entered against the company as of that date, and it was not involved in the accounting subsequently to April 16, 1910, which was referred to the master. The disallowance of these items that have been referred to is traceable entirely to Ownbey's failure to furnish sufficient proof. Ownbey appears to have been accustomed to business transactions, and the books were properly kept as to most transactions of the company, and vouchers and receipts were commonly supplied. The bookkeepers for the company appear to have been skilled, and to have kept the accounts properly so far as their information enabled them to do so. They depended on Ownbey for much of the important information needed by them, and the failure of the records; as well as the failure of the testimony as to these particular expenditures, is traceable to Ownbey's failure to record or remember the times, amounts, or purposes of the expenditures for which he now asks credit.

Summarizing, the decree should be modified, so that Ownbey will be charged with the amounts that we have disallowed, but credited with the amount of salary allowed by the master. The master's statement of the account of his transactions with the company since April 16, 1910, will then stand modified as follows:

| Debits. | | Credits. | |
|---|---|---|---|
| To balance due to company as per master's report.... | $ 4,328.85 | By amount of salary......$57,609.52 | |
| To pasturage .............. | 629.27 | By checks on First National Bank of Boulder and American Exchange National Bank of New York.. | 2,260.55 |
| To balances in First National Bank of Boulder and in American Exchange National Bank of New York.. | 11,072.94 | | |
| To general expenses, items disallowed .............. | 2,288.75 | | |
| To living expenses, items disallowed .................. | 22,484.57 | | |
| To traveling expenses, items disallowed .............. | 10,866.65 | | |
| To legal expenses, items disallowed ................ | 5,368.60 | | |
| To telephone expenses, items disallowed .............. | 1,413.55 | | |
| To interest expenses, items disallowed .............. | 1,392.39 | | |
| To miscellaneous expenses, items disallowed ........ | 775.34 | | |
| To supplementary account, items disallowed ........ | 2,250.00 | | |
| | $62,870.91 | | $59,870.07 |

Balance due from Ownbey to the Wootton Company $3,000.84. In addition to this amount, the plaintiff is entitled to an accounting of transactions prior to April 16, 1910. Whether the balance of indebtedness claimed to be shown against Ownbey on the ledger of the company of $23,638.78 is a correct charge, or whether the claim of a further indebtedness of Ownbey at that time is correct, is a matter that was not heard fully on proofs by the court below, because of the holding that the accounting should not extend to transactions prior to April 16, 1910, and cannot now be decided upon this record, and no opinion is expressed thereon.

[7] The conclusions reached as to questions represented by the appeal makes it unnecessary to consider more than one question presented by the cross-appeal. The essential facts relating to this cross-appeal are as follows: After the first reference to the master had been made, some of the plaintiffs in the present case—that is, the plaintiffs who sue as executors of the last will and testament of J. Pierpont Morgan—began a suit in a state court of Delaware against the defendant Ownbey, to recover the sum of about $140,000 for money loaned by Morgan to Ownbey, and under an order of attachment a levy was made upon Ownbey's shares of stock in the Wootton Company. Judgment was afterwards rendered in favor of these plaintiffs against Ownbey for an amount exceeding $200,000. A petition by Ownbey to have this judgment set aside was denied. See Morgan v. Ownbey, 29 Del. (6 Boyce) 379, 100 Atl. 411, affirmed Ownbey v. Morgan (Del.) 105 Atl. 838. Ownbey filed in the court below a supplemental bill, setting forth these proceedings in the Delaware court, and prayed and was granted a temporary order against

Morgan's executors, restraining the sale of Ownbey's stock under the judgment rendered in Delaware. This order was dissolved by the court's final decree, and a permanent injunction denied, and this is assigned as error. In support of the assignment it is urged that the trial court in this case had first obtained exclusive jurisdiction of the subject-matter which was being litigated in the Delaware suit. There was no error in the court's ruling. The suit in Delaware was an action on behalf of Morgan's representatives upon a personal obligation of Ownbey originally due to Morgan. The res that gave that court its jurisdiction to proceed was Ownbey's stock in the Wootton Company, attached by process in that action. The suit in the court below was a suit by Morgan's executors and by another, as stockholders in a corporation, suing on behalf and for the benefit of all stockholders, and asserting rights of the corporation as against Ownbey. Claims of indebtedness between Morgan and Ownbey were foreign to the questions of indebtedness between the Wootton Company and Ownbey, and the denial of the injunction was a proper compliance with section 265 of the Judicial Code (Comp. St. § 1242).

For the reasons stated, the case will be remanded, with directions to proceed further with the accounting ordered for the period prior to April, 1910, if the parties are so advised, and otherwise the decree will be modified to conform to the views expressed herein. The appellants are entitled to their costs expended on the appeal in case No. 5265; no costs to be taxed to either party in No. 5266.